IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN R. DANNER, JR.,              :
MARTHA E. DANNER,
EMMA E. PETERS,                   :
RUTH A. THOMPSON,
        Plaintiffs
                                  :

        vs.                       :    CIVIL NO. 1:CV-06-2270

                                  :
TOWER ACQUISITION, LLC,
        Defendant                 :


*M E M O R A N D U M*

I.    *Introduction.*

        The plaintiffs, John R. Danner, Jr., Martha E. Danner,

Emma M. Peters, and Ruth A. Thompson, filed this action in

ejectment in state court to oust defendant, Tower Acquisition,

LLC, from a four-acre plot of land Plaintiffs own. Plaintiffs

had leased the land to a predecessor in interest of Defendant,

and it has been used for a cell tower.

        Tower Acquisition purchased the right in the leasehold

from a debtor in bankruptcy, International Communications Group,

Inc. (ICG). It removed the action to this court, asserting we

have diversity and bankruptcy jurisdiction to entertain the

action. Defendant has also moved to transfer the case to the

United States Bankruptcy Court for the Northern District of

Texas, where the bankruptcy proceedings are ongoing.

We are considering Plaintiffs' motion to remand to state court for lack of jurisdiction. Plaintiffs argue the amount in controversy does not exceed the $75,000 threshold for diversity jurisdiction and that bankruptcy jurisdiction is lacking here because the lease, having been sold, is no longer part of the bankruptcy estate so that their action in ejectment can have no effect on the estate in bankruptcy. Conversely, Defendant argues that the amount in controversy is in excess of the jurisdictional amount, when viewed from the point of view of Defendant as the tenant. Additionally, bankruptcy jurisdiction exists because resolution of the ejectment action will require interpretation of the bankruptcy court's orders and notices.

We conclude that we have no jurisdiction on either basis and will remand to the state court.

II.    *Background*.

On September 7, 1984, Plaintiffs leased a four-acre plot of land to Quest Microwave VII, Inc. (Qwest) for an original term of ten years designated as beginning on September 1, 1984.[1] Quest started using the land for a communications tower. The lease gave Qwest the option of extending it for two additional ten-year terms by providing written notice to the Plaintiffs during the last year of each lease period. (Doc. 14-

---

[1]    Other parties listed as landlords on the lease were John R. Danner's father and Joan M. Danner.

2, Ex. A, "Ground Lease Agreement," ¶ 2.02, the "Right to Extend" clause). Otherwise, the lease converted to one from month to month. (*Id.*, ¶ 2.03, the "Holding Over" clause). During the first ten-year term, Qwest assigned its interest under the lease to Qwest Communications, Inc. (Qwestcom). Before the original term expired, Qwestcom extended the lease for another ten-year term ending on August 31, 2004. Qwestcom then assigned its interest to Corban Towers, Inc. (Corban Towers).

Corban Towers and an affiliated company, Corban Communications, Inc., filed a voluntary Chapter 11 petition in bankruptcy on March 12, 2004, in the United States Bankruptcy Court for the Northern District of Texas.[2] According to Defendant, "[a]s debtors in possession, Corban Towers, Inc. and Corban Communications, Inc. notified Plaintiffs of their intention to assume the ground lease, auction and sell it, and then assign it to the highest and best bidder." (Doc. 19, Defs.' Br. in Opp'n to Remand at p. 2). Defendant asserts that this "written notice . . . sent to Plaintiffs on May 1, 2004," before the end of the second ten-year term on August 31, 2004, also "exercis[ed] the option to extend the lease for the final ten-year term" to end on August 31, 2014. (*Id.*) According to

---

[2] Defendant has presented us with no filings from the bankruptcy proceedings mentioned in this memorandum. We rely solely on Defendant's representations in its brief as to what transpired in the bankruptcy court. Plaintiff does not dispute the procedural history of the bankruptcy case.

Defendant, Plaintiffs did not object, and ICG, as the highest
bidder, bought the lease.[3]

On August 12, 2004, the bankruptcy court approved the
sale of substantially all the assets of Corban Communications to
ICG. At the same time, the court also entered a separate order
approving assumption of the lease by Corban Towers, which at
that time was owned by ICG. (Doc. 3, Defs.' Br. in Supp. of
Transfer at p. 5-6).

Although Defendant asserts here that the lease was
renewed for its final ten-year term by the May 2004 notice to
Plaintiffs notifying them that the debtors intended to assume
the lease, an entity named Corban Networks, Inc. sent a letter
to Verna Danner on November 5, 2004, about a month after the
second ten-year lease term ended, purporting to exercise "the
final renewal option" to extend the lease "for a five (5) year
term beginning September 1, 2004."[4] (Doc. 14, Ex. B). The letter
continued: "We realize this renewal request is in arrears, but
have taken the liberty of providing a check for the full amount
due for the 2004-2005 rental term at the adjusted rental rate of

---

[3] The intention to assume the lease was accomplished by an
"Amended Motion to Assume and Assign Unexpired Leases and
Executory Contracts and to Approve Cure Amounts" filed in the
bankruptcy court on April 30, 2004. (Doc. 3, Defs.' Br. in Supp.
of Transfer at p. 5). The notice to Plaintiffs was sent by
first-class mail. (*Id.*)

[4] As noted, renewal could have been for a ten-year term.
The parties do not comment on the reference to a five-year term.
According to the complaint, Plaintiffs are the children of Verna
Danner, wife of John R. Danner, Sr.

$2,710.02." (*Id.*) The letter requested that Verna Danner sign a copy of the letter and return it to Corban Networks, Inc. to indicate acceptance of the renewal. (*Id.*)[5]

Nearly one year later, on August 3, 2005, creditors filed an involuntary bankruptcy petition against ICG in the same Texas bankruptcy court. On or about November 15, 2005, the court entered an order for relief. Around this time, Corban Towers filed a second voluntary petition in bankruptcy, and the court consolidated the bankruptcy cases of ICG and Corban Towers into the ICG bankruptcy.

Once again, the debtors, according to Defendant, determined that the lease should be assumed and then sold to the highest bidder. ICG so notified Plaintiffs. Defendant asserts that it:

> emerged as the highest bidder for a bundle of ICG's assets, including ICG's leasehold interest under the lease, which ICG and Tower Acquisition understood to have a term ending in 2014. Again, the Texas bankruptcy court approved every aspect of the sale process and entered final orders conveying and assigning the ground leasehold and related tower to Tower Acquisition. Again, Plaintiffs received notice of all aspects of the sale and assignment, but failed to appear or raise any concern or objection to the sale or the assignment.

(Doc. 19, Defs.' Br. in Opp'n to Remand at p. 2). Specifically, according to Defendant's brief, the bankruptcy court's order of

---

[5]  Plaintiffs assert this letter was not sent to them, and they did not sign and return it. Defendant says the check was cashed.

April 3, 2006, allowed the debtors to assume the lease and approved its assignment to Tower Acquisition.

On October 25, 2006, Plaintiffs filed their action in ejectment against Tower Acquisition in the Court of Common Pleas of York County, Pennsylvania. (Doc. 6, Ex. A to notice of removal). The complaint alleges that when Qwestcom held the leasehold, it timely exercised the option to renew for the second ten-year term but that thereafter the term expired on August 31, 2004, without a timely renewal; that on January 16, 2006, Plaintiffs' counsel notified Corban Networks that the lease would be terminated on February 28, 2006; that Corban Networks "purported" to assign the lease to Tower Acquisition on April 3, 2006; and that Defendant has refused to leave the land. Plaintiffs request that they be granted a quiet title and that Defendant be ordered to leave the land.

III.  *Discussion.*

     A.  *Diversity Jurisdiction Is Absent Because the Amount in Controversy Does Not Exceed $75,000.*

Defendant removed the state-court action here pursuant to 28 U.S.C. § 1441(a), invoking our diversity jurisdiction under 28 U.S.C. § 1332(a) for "all civil cases where the matter in controversy exceeds the sum or value of $75,000," *id.*, between "citizens of different states." *Id.*, § 1332(a)(1). "[T]he burden of establishing removal jurisdiction rests with

the defendant," *Dukes v. U.S. Healthcare, Inc.*, 57 F.3d 350, 359 (3d Cir. 1995) (defendant invoked 28 U.S.C. § 1331 federal-question jurisdiction), as it does generally for any party asserting the jurisdiction of the federal court. *See McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 286 (3d Cir. 2006)("The party asserting diversity jurisdiction bears the burden of proof."); *see also Samuel-Bassett v. Kia Motors Am., Inc.*, 357 F.3d 392, 396 (3d Cir. 2004)("The party asserting jurisdiction bears the burden of showing at all stages of the litigation that the case is properly before the federal court."). Additionally, Defendant must "show to a legal certainty that the amount in controversy exceeds the statutory minimum . . ." *Id.* at 398.[6]

The dispute here is whether the matter in controversy exceeds $75,000. (Defendant agrees that the parties are citizens of different states for the purpose of section 1332(a)(1)). Defendant says that it does, by looking to the value of the lease for the tenant. According to Tower Acquisition's vice-president, that value includes: (1) rental from leasing space on the communications tower that is not less than $101,100 for the remaining eight years of the lease; and (2) the "right of first refusal to purchase the ground leasehold," which is valued by the cost of having to remove the tower and related equipment, in excess of $75,000. (Doc. 19, Ex. 1, penalty-of-perjury

---

[6] Defendant argues that the standard is lower, that it only has to show a "probability" that the amount-in-controversy requirement has been satisfied, but we reject that argument.

declaration of Stephen G. Kotfila). In addition, Defendant relies directly on the $75,000-plus cost of removing the tower and related equipment to satisfy the amount-in-controversy requirement.

To support this approach Defendant cites *John B. Kelly, Inc. v. Lehigh Nav. Coal Co.*, 151 F.2d 743 (3d Cir. 1945), arguing that the Third Circuit's "well established legal standard" (doc. 19, Defs.' Br. in Opp'n to Remand at p. 5) calculates "the jurisdictional amount . . . on the basis of the property right which is being injured." *Kelly, Inc.*, 151 F.2d at 746. Defendant also cites *Privateer Bay Mgmt. Corp. v. Heirs of Sewer*, 102 Fed. Appx. 228 (3d Cir. 2004)(nonprecedential), which held that the jurisdictional amount was satisfied in a quiet-title action by the value of the land.

Plaintiffs reply to this by arguing that the amount in controversy is calculated not by the value of the leasehold to the defendant but by the value of the property to the plaintiff, as the very cases Defendant cites make clear. We agree with Plaintiffs. In *John B. Kelly, Inc.*, a suit seeking injunctive relief for nuisance and trespass against a business upstream from the plaintiff claiming to injure the plaintiff's business, the court calculated the amount in controversy by the property right of the plaintiff being injured. 151 F.2d at 747 ("when a litigant seeks an injunction to protect a right . . . the test of the jurisdictional amount is the value of the right that is

to be protected")(quoted case omitted). In *Privateer Bay Mgmt. Corp.*, the court flatly stated that "in an action to quiet title, the amount in controversy is the value of the land . . . ." 102 Fed. Appx. at 231, and relied on a 2001 tax assessment, $291,004, to establish jurisdiction. *Id.* (citing 14B Wright, Miller & Cooper, Federal Practice & Procedure § 3702 at 85 (3d ed. 1998)). This appears to be the general approach. *See Maida v. Retirement & Health Servs. Corp.*, 1994 WL 514521, at *2 (6th Cir. 1994) (nonprecedential)(per curiam)(the amount-in-controversy requirement was satisfied in a quiet-title action for real estate valued at $5.5 million); *Sanchez v. Taylor*, 377 F.2d 733, 736 (10th Cir. 1967)(the amount in controversy was met for what was essentially a quiet-title action for real estate purchased at $497,700.93).

In their rely brief, Plaintiffs calculate the amount in controversy by starting with the tax assessment of the property. The ten-acre tract on which the four-acre leasehold is situated is assessed at $86,850, and the cell-tower improvements are assessed at $6,420. (Doc. 21, Plaintiffs.' Reply Br., Ex. A, York County tax assessment for "Danner Ln", available from http://216.174.25.68/york/map index.asp). The leasehold occupies forty percent of the assessed land, and forty percent of the real estate assessment is $34,740 so that even if the assessed value of the improvements is included in the amount in

controversy, it only comes to $41,160, far less than the $75,000 threshold. Hence, diversity jurisdiction is absent.

We agree with Plaintiffs' analysis. We also note that Defendant, with the burden of establishing removal jurisdiction here, did not provide us with a legally tenable basis for concluding that the amount in controversy exceeded $75,000, focusing instead on the value of the leasehold to it, and not the claim being made by the plaintiffs. *See Samuel-Bassett, supra*, 357 F.3d at 398 ("In removal cases, determining the amount in controversy begins with a reading of the complaint filed in the state court" and the recovery the plaintiff is seeking). Even if we added in the rental payments due on the remaining eight years of the lease, a time period used by Defendant, we would add only about $21,680 to the amount (making it $62,840), still short of the $75,000 threshold, and certainly not enough to meet Defendant's burden on removal to establish the amount in controversy to a legal certainty.

When we also observe that removal on the basis of diversity jurisdiction is strictly construed against removal, *id.* at 396, we conclude that diversity jurisdiction is lacking here. We turn now to Defendant's argument that we have bankruptcy jurisdiction.

B.  *There Is No Bankruptcy Jurisdiction*.

As an alternative basis for jurisdiction, Defendant removed the state-court action here pursuant to 28 U.S.C. §

1452(a)(bankruptcy removal), invoking our "original but not exclusive jurisdiction" under 28 U.S.C. § 1334(b) in bankruptcy for "all civil proceedings arising under title 11, or arising in or related to cases under title 11." As with removal under 28 U.S.C. § 1441(a) for a diversity case, Defendant, as the removing party, has the burden of establishing bankruptcy jurisdiction. *Triplett v. United Behavioral Health Sys., Inc.*, 1999 WL 238944, at *4 (E.D. Pa.); *see also New Jersey Dep't of Envtl. Prot. v. Dixo Co.*, 2006 WL 2716092, at *2 (D.N.J.)("As with removal petitions based on other statutes," the removing party has "the burden of establishing the propriety of removal and the existence of federal jurisdiction under section 1442(a)(1)," authorizing removal of cases against federal officers or agencies).

Before discussing the parties' arguments, we briefly set forth the law in this area.

> Bankruptcy jurisdiction extends to four types of title 11 matters: (1) cases "under" title 11; (2) proceedings "arising under" title 11; (3) proceedings "arising in" a case under title 11; and (4) proceedings "related to" a case under title 11. *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 225 (3d Cir. 2005). The category of cases "under" title 11 "refers merely to the bankruptcy petition itself." *Id.* at 225-26 n.38 (quotation and citation omitted). A case "arises under" title 11 "if it invokes a substantive right provided by title 11." *Torkelsen v. Maggio (In re Guild & Gallery Plus, Inc.),* 72 F.3d 1171, 1178 (3d Cir. 1996). . . . The category of proceedings "arising in" bankruptcy cases "includes such things as administrative matters, orders to

> turn over property of the estate and
> determinations of the validity, extent, or
> priority of liens." 1 *Collier on Bankruptcy*
> § 3.01[4][c][iv] at 3-31 (quotations and
> footnotes omitted). Proceedings "arise in" a
> bankruptcy case, "if they have no existence
> outside of the bankruptcy." *United States
> Trustee v. Gryphon at the Stone Mansion,
> Inc.*, 166 F.3d 552, 556 (3d Cir. 1999).
> Finally, a proceeding is "related to" a
> bankruptcy case if "the outcome of that
> proceeding could conceivably have any effect
> on the estate being administered in
> bankruptcy." *In re Pacor, Inc. v. Higgins,*
> 743 F.2d 984, 994 (3d Cir. 1984); *see also
> In re Federal-Mogul Global, Inc.*, 300 F.3d
> 368, 381 (3d Cir. 2002) (noting that *Pacor*
> "clearly remains good law in this circuit"
> in this respect).

*Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006)(footnote

omitted). A distinction is made between "core" and "non-core"

proceedings. Core proceedings are from the first three

categories: (1) a case "under" title 11; (2) a proceeding

"arising under" title 11; and (3) a proceeding "arising in" a

case under title 11. *Id.* at 217 (quoting *In re Combustion Eng'g,

Inc.*, 391 F.3d 190, 225 (3d Cir. 2004)). Non-core proceedings

are proceedings related to a case under title 11. *Id.*

This is not a bankruptcy case, *see Stoe, supra*, 436

F.3d at 216 (a case "under" title 11 refers to the bankruptcy

case itself), so we are concerned here only with the last three

categories of bankruptcy jurisdiction: (1) "arising under"

jurisdiction; (2) "arising in" jurisdiction; and (3) "related

to" jurisdiction.

In moving to remand, Plaintiffs argue that we lack bankruptcy jurisdiction because their ejectment action does not fit any of these jurisdictional categories. As to the first two categories, their case does not arise under title 11 or arise in a case under title 11 because it is based on state law. As to "related to" jurisdiction, they make two points against it. First, the lease has already been sold out of the bankruptcy estate, and after an asset has been sold, the bankruptcy court no longer has jurisdiction over it, citing *In re Edwards*, 962 F.2d 641 (7th Cir. 1992); *In re Hall's Motor Transit Co.*, 889 F.2d 520 (3d Cir. 1989); and *In re Xonics*, 813 F.2d 127 (7th Cir. 1987). Second, because the asset is no longer part of the estate, this litigation "between the purchaser and a third party can have no effect on the debtor, his assets, his liabilities, or the bankruptcy estate as neither the debtor, nor the estate have any further interest in the asset." (Doc. 14, Plaintiffs' Br. in Supp. of Remand at p. 9).

In opposing remand, Tower Acquisition argues we have jurisdiction here because the ejectment action is a core proceeding under bankruptcy law on two grounds. First, the action challenges substantive rights created by title 11, specifically rights conferred by 11 U.S.C. §§ 363 and 365 upon a purchaser of assets in bankruptcy to finality in the purchase, i.e., to own the assets free and clear. As Defendant also puts it, "[C]ore bankruptcy jurisdiction exists over . . . rights a

13

purchaser acquired in the sale." (Doc. 19, Defs.' Br. in Opp'n
to Remand at p. 8). In support of this argument, Defendant cites
*Tenet Healthsystem Philadelphia, Inc. v. Nat'l Union of Hosp. &
Health Care Employees (In re Allegheny Health, Educ. & Research
Found.)*, 383 F.3d 169 (3d Cir. 2004).

Second, the relief requested in the action is
intertwined with events occurring in the bankruptcy proceedings.
As Defendant puts it:

> [T]his lawsuit directly implicates and
> challenges the Corbin Communications and ICG
> bankruptcy proceedings because the very
> events of those bankruptcy proceedings
> govern who is entitled to the leasehold
> rights of the tower ground lease. In fact,
> it is precisely the sale processes and final
> orders selling and assigning the lease to
> Tower Acquisition that *give rise* to the
> federal jurisdiction here. It was through
> the sale process in the Corbin Towers
> bankruptcy case that the debtor gave notice
> to Plaintiffs that effected a ten-year
> extension of the lease term. The bankruptcy
> court approved both the form and the
> adequacy of that notice, and then entered
> final orders conveying and assigning the
> extended leasehold right - twice.
> Plaintiffs' claims therefore are not
> isolated from federal jurisdiction merely
> because a sale has been finalized. Those
> claims directly involve the Corbin
> Communications and pending ICG bankruptcy
> proceedings.

(Doc. 19, Defs.' Br. in Opp'n to Remand at p. 16-17)(emphasis in
original). In support of this argument, Defendant cites *Luan
Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304
F.3d 223 (2d Cir. 2002), and *Citizens Bank & Trust Co. v. Case
(In re Case)*, 937 F.2d 1014 (5th Cir. 1991).

We disagree with Defendant's first argument. Like Plaintiffs, we see no connection between bankruptcy jurisdiction and the mere invocation of sections 363 and 365. Defendant talks about core bankruptcy jurisdiction over "rights" acquired in a sale but does not specify what those rights are or what subsections of sections 363 and 365 are involved. In effect, it is saying that the mere purchase of an asset from a bankruptcy estate confers jurisdiction on the bankruptcy court for a suit against the buyer involving the asset. But that is directly contrary to the Third Circuit's ruling in *In re Hall's Motor Transit Co.*, *supra*, cited by Plaintiffs, where the court held that when an asset is purchased from the estate, the bankruptcy court's jurisdiction over the asset ceases. 889 F.2d at 522. Quoting *In re Xonics*, *supra*, 813 F.2d at 131, the court also stated: "'Otherwise any one who could trace his title to a bankrupt would invoke federal jurisdiction to settle disputes affecting that property.'"[7]

Defendant's reliance on *Tenet Healthsystem Philadelphia, Inc.*, *supra*, to support its argument is misplaced.

_____

[7] In *In re Hall's Motor Transit*, the asset was a tractor-trailer freight terminal. Significantly, after rejecting the idea that jurisdiction extended to any asset that had once been owned by the debtor, the court of appeals did examine whether there was "related to" jurisdiction. Using the appropriate test, the court concluded that there was not because the purchaser's suit, which sought declaratory and injunctive relief against the local municipality's ticketing of its trucks, could not have had any conceivable effect on the estate being administered in bankruptcy. 889 F.2d at 522-23.

15

That case did hold that an adversary proceeding was a core proceeding (meaning that the bankruptcy court had jurisdiction over it) "because it required the court to interpret and give effect to its previous sales orders." 383 F.3d at 176. However, the sales orders gave approval to the substantive provisions of an asset purchase agreement, and it was the substantive provisions of the asset purchase agreement that were at issue in the adversary proceedings, having been "enshrined in the sales orders." *Id.* at 177.

To provide some detail, the plaintiff Tenet had purchased certain hospitals from the bankrupt estate. Under the asset purchase agreement for the hospitals, Tenet assumed certain contracts of the debtor, including a collective-bargaining agreement with the defendant union, and refused to honor certain liabilities. Among those excluded liabilities were obligations under assumed contracts that occurred before the closing date of the sale. Upon motion of the debtor and after notice to the union, the bankruptcy court approved the asset purchase and the assignment of the assumed contracts to Tenet in two sales orders. The sales orders also required "the non-debtor parties to the assumed contracts to assert any claims for existing defaults against [the debtor] in the bankruptcy or else to be barred from asserting the claims." 383 F.3d at 173.

After the sale, Tenet and the union disagreed about sick-leave benefits for union members. The union took it to

arbitration, and the arbitrator decided that Tenet had to credit workers with accrued sick leave and also in the future to pay for the first day of sick leave. Tenet then filed its adversary proceedings in the bankruptcy court, seeking to vacate the arbitrator's award and also seeking indemnity against the debtor under the asset purchase agreement for the monetary award against it for the accrued sick leave.

On these facts, Tenet's action was a core proceeding. It involved the interpretation and enforcement of substantive provisions of the asset purchase agreement, provisions "enshrined in the sales orders." But it does not follow from *Tenet* that the ejectment action here is also a core proceeding. Defendant is citing *Tenet* to support the narrow argument that bankruptcy jurisdiction exists for suits challenging rights acquired in a bankruptcy sale, but does not say as part of its argument what those rights are or how they arose. Conversely, in *Tenet*, those rights were specified and located in the asset purchase agreement: exclusion of certain liabilities and indemnity from the debtor if found liable for them. Here, in contrast, we merely have the bald argument that jurisdiction exists because Plaintiffs' suit purportedly challenges certain (unspecified) rights acquired in bankruptcy.[8]

---

[8]   We reject Defendant's contention, relying on *Tenet*, that Plaintiffs are attempting to defeat jurisdiction by arguing the merits of their ejectment action. Plaintiffs make no such argument.

*Tenet* actually bears more on Defendant's second argument for jurisdiction, that the relief requested in the ejectment action is intertwined with events occurring in the bankruptcy proceedings.[9] Specifically, Defendant relies on the following: (1) the notice to Plaintiffs in the Corbin Towers bankruptcy case informed Plaintiffs that a ten-year extension of the lease term had been effected; (2) bankruptcy court approval of both the form and the adequacy of that notice; and (3) final orders conveying and assigning the extended leasehold right, not just in the Corbin Towers bankruptcy but in the subsequent consolidated bankruptcy cases of ICG and Corban Towers.

The problem with this argument is, as Plaintiffs point out, Defendant has not provided us with copies of the relevant documents from the bankruptcy cases. It may be that the debtors' motions to assume the lease, the notices sent to Plaintiffs, and the bankruptcy court orders all provided that the lease was being extended for the second ten-year period, and that this might justify bankruptcy jurisdiction under the cases Defendant cites: *Luan Inv. S.E., supra,* 304 F.3d 223, and *Citizens Bank & Trust Co., supra,* 937 F.2d 1014. But we do not have the documents before us, and we cannot rely on Defendant's

---

[9] In closing its argument based on *Tenet*, Defendant contends "[i]t is the very fact that Plaintiffs' claims implicate the bankruptcy notice and sale processes, and require interpretation and enforcement of bankruptcy sale and assignment orders that gives rise to core bankruptcy jurisdiction here." (Doc. 19, Defs.' Br. in Opp'n to Remand at p. 10).

representations in its brief as to their significance. *See Dukes v. U.S. Healthcare, Inc.*, 57 F.3d 350, 358-59 (3d Cir. 1995)(defendant has the burden of establishing removal jurisdiction so if it does not provide the contract documents allegedly establishing ERISA jurisdiction, the court is in no position to evaluate the argument); *Triplett, supra*, 1999 WL 238944, at *4 (E.D. Pa.)(removal on the basis of bankruptcy jurisdiction rejected when defendant failed to provide the court with the bankruptcy documents it based jurisdiction on, leaving the court unable to determine if defendant's counsel's "characterization of [the] documents [was] accurate").

Having rejected Defendant's grounds for jurisdiction, we  see no other basis for asserting it. As Plaintiffs argue, we do not have "arising under" or "arising in" jurisdiction. "A case 'arises under' title 11 'if it invokes a substantive right provided by title 11,'" *Stoe*, *supra*, 436 F.3d at 216 (quoted case omitted), or, alternatively, if the Bankruptcy Code "creates the cause of action or provides the substantive right invoked." *Id.* at 217. Plaintiffs' cause of action was not created by the Code, nor do they invoke substantive rights under bankruptcy law. Their cause of action is a state-law one for ejectment. Further, "[t]he fact that federal bankruptcy law is implicated as a defense to [Plaintiffs'] claim, does not change the fact that [Plaintiffs'] claim itself does not 'arise under' title 11." *Id.* "Arising in" jurisdiction exists for "claims that

by their nature, not their particular factual circumstance, could only arise in the context of a bankruptcy case." *Id.* at 218. An action in ejectment can clearly arise outside the context of a bankruptcy case.

Nor do we have "related to" jurisdiction, the broadest form of bankruptcy jurisdiction. *See In re: Resorts Int'l, Inc.*, 372 F.3d 154, 163 (3d Cir. 2004). Under "related to" jurisdiction:

> bankruptcy courts have jurisdiction to hear a proceeding if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." [*In Re Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984]. In *In re Marcus Hook,* 943 F.2d 261, we emphasized that a key word in this test is "conceivable" and that "[c]ertainty, or even likelihood, is not a requirement." *Id.* at 264. In *Pacor,* we observed: "[T]he proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." 743 F.2d at 994. The Supreme Court has explained that the critical component of the *Pacor* test is that "bank-ruptcy courts have no jurisdiction over proceedings that have no effect on the estate of the debtor." *Celotex* [*Corp. v. Edwards*, 514 U.S. 300,] 308 n.6, 115 S.Ct. 1493.

*Id.* at 164 (brackets added). This lawsuit will not have any effect on the debtors' rights, liabilities, options, or freedom of action or in any way impact upon the handling and administration of the estate. If Plaintiffs are successful in

their ejectment action, it will only mean that Defendant must vacate the premises.

Defendant does not make the argument, relying instead on jurisdiction for core proceedings, but the only conceivable impact on the bankruptcy proceedings appears to be that if Defendant losses the ejectment action, it might in turn move in the bankruptcy court to vacate or modify the sales order approving the sale of the leasehold to it. But this contingency is not enough for "related to" jurisdiction because the debtors, not being parties to the ejectment action, would be free to relitigate any issue, whether Plaintiffs won or lost in state court. *See In Re Pacor, Inc. v. Higgins*, 743 F.2d 984, 995 (3d Cir. 1984). As the Third Circuit has also noted: "The test articulated in *Pacor* for whether a lawsuit could 'conceivably' have an effect on the bankruptcy proceeding inquires whether the allegedly related lawsuit would affect the bankruptcy proceeding without the intervention of yet another lawsuit." *In re Federal-Mogul Global, Inc.*, 300 F.3d 368, 382 (3d Cir. 2002). It would require the intervention of another proceeding before the ejectment action could have an effect on the bankruptcy proceedings. *See Susquehanna Commercial Fin., Inc. v. Herdocia*, 2007 WL 137837, at *4 (E.D. Pa.)(the defendant's potential claim against the bankrupt did not create "related to" jurisdiction since it had not yet accrued and would require another lawsuit). *Compare Stoe*, *supra*, 436 F.3d at 218-19 ("related to"

jurisdiction exists for a lawsuit between a nondebtor plaintiff and a third party for the third party's guarantee of the debtor's obligation arising from statute or contract).

IV.    *Conclusion.*

Defendant has filed a motion to transfer. Based on our conclusion that we lack jurisdiction, that motion will be denied as moot. We will issue an appropriate order.

<u>/s/William W. Caldwell</u>
William W. Caldwell
United States District Judge

Date: March 22, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


JOHN R. DANNER, JR.,                :
MARTHA E. DANNER,
EMMA E. PETERS,                     :
RUTH A. THOMPSON,
        Plaintiffs
                                    :

        vs.                         :   CIVIL NO. 1:CV-06-2270

                                    :

TOWER ACQUISITION, LLC,
        Defendant                   :


*O R D E R*


        AND NOW, this 22nd day of March, 2007, it is ordered
that:

        1. Plaintiffs' motion (doc. 12) to remand
        to state court for lack of jurisdiction is
        granted.

        2.  The Clerk of Court shall remand this
        action to the Court of Common Pleas of York
        County, Pennsylvania.

        3.  Defendant's motion (doc. 2) to
        transfer is dismissed as moot.


                        /s/William W. Caldwell
                        William W. Caldwell
                        United States District Judge